IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Garnet Thomas,                              )
                                            )    Civil Action No. 6:15-3251-MBS-KFM
                            Plaintiff,      )
                                            )    **REPORT OF MAGISTRATE JUDGE**
            vs.                             )
                                            )
Carolyn W. Colvin, Acting                   )
Commissioner of Social Security,            )
                                            )
                            Defendant.      )
_____         )

   This case is before the court for a report and recommendation pursuant to

Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

   The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying his claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits on April 4, 2012, alleging that he became

unable to work on March 15, 2012.  The applications were denied initially and on

reconsideration by the Social Security Administration.  On September 13, 2012, the plaintiff

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and

G. Roy Sumpter, Ph.D., an impartial vocational expert, appeared on December 3, 2013,

---

[1] A report and recommendation is being filed in this case, in which one or both
parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on March 25, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

(2)    The claimant has not engaged in substantial gainful activity since March 15, 2012, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq*. and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: chronic obstructive pulmonary disease ("COPD"), asthma, mood disorder, obsessive-compulsive disorder ("OCD"), and anxiety disorder (20 C.F.R. §§ 404.1520(c) and 416.920 (c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). .

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 10 C.F.R. § 404.1567(c) and 416.967(c), except the claimant should avoid concentrated exposure to dust and fumes. The claimant is further limited to simple, routine, repetitive tasks and instructions; no contact with the public; no work groups; and no assembly line work.

(6)    The claimant is unable to perform his past relevant work in maintenance and shipping (20 C.F.R. §§ 404.1565 and 416.965.

.

(7)    The claimant was born on June 2, 1964, and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

2

(9)    Transferability of job skills is not an issue because the claimant is limited to unskilled work (20 C.F.R. §§ 404.1568 and 416.968).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569(a), 404.1569(a), 416.969, and 416.969(a).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2012, through the date of this decision on April 29, 2014 (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that

3

prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

4

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 47 years old on the alleged disability onset date (March 15, 2012) and was 49 years old on the date of the ALJ's decision (March 25, 2014). The plaintiff finished the tenth grade and has past relevant work experience in maintenance and shipping (Tr. 35, 181, 196).

***Medical Evidence***

The plaintiff sought treatment for his medical complaints (e.g., psoriasis, bronchitis, conjunctivitis, etc.) primarily from The Family Medical Center (Tr. 253-57, 292-310, 318-38, 345-47, 351-54). On March 6, 2012, Ralph Tesseneer, M.D., one of the plaintiff's primary care physicians at The Family Medical Center, evaluated the plaintiff for follow-up related to his medications.[2] The plaintiff's wife reported that the plaintiff's mood was still quite variable. The plaintiff indicated that losing his job in January had been very difficult to deal with. He admitted to becoming very angry and feeling like he was panicking at times. Dr. Tesseneer noted that the plaintiff tended to stay in his house and did not like

---

[2]The first record in the file from Dr. Tesseneer's practice is a follow-up visit dated February 15, 2008 (Tr. 308).

5

to go out or be around others.  He noted that when the plaintiff was angry or agitated he would not be physically abusive to others but was tended to tear things up like TVs, etc. Dr. Tesseneer indicated that the plaintiff had a family history of mental disorders and that his mood problems probably started around age 18.  Dr. Tesseneer also noted that the plaintiff was a smoker and had morning cough and wheezes at night.  On examination, the plaintiff had increased expiratory lung phase.  The plaintiff was anxious and somewhat restless but appropriately oriented.  Dr. Tesseneer diagnosed "suspect bipolar disorder associated with anxiety and poor impulse control."  Dr. Tesseneer started the plaintiff on a trial of Seroquel and noted that he might need assistance in obtaining medications due to financial constraints.  Dr. Tesseneer also prescribed Xanax and Albuterol inhaler.  Dr. Tesseneer also suggested that the plaintiff would benefit from counseling but that he was "loathed to proceed at this time" (Tr. 255-57, 314).  While the plaintiff made mental health related complaints (e.g., depression, anxiety, etc.) to the medical practitioners whom he saw at The Family Medical Center, they did not regularly conduct mental status exams to evaluate the complaints (Tr. 253-54, 292-95, 298-308, 324-26, 334).

On March 15, 2012, Dr. Tesseneer evaluated the plaintiff and noted that the change in medication had caused him to be too sedated.  Dr. Tesseneer indicated that the plaintiff continued to be quite moody and misanthropic and that he was acutely anxious, then acutely depressed, and then acutely angry and impulsive.  Dr. Tesseneer indicated that he felt that the plaintiff was likely social phobic as well as bipolar.  He discussed referral to a mental health clinic and prescribed Depakote.  Dr. Tesseneer also prescribed Advair for bronchospasm and recommended that the plaintiff quit smoking (Tr. 254).  On March 20, 2012, the plaintiff's wife reported that the Depakote was working better than Seroquel but that the plaintiff was still getting agitated (Tr. 254).

On April 2, 2012, Dr. Tesseneer evaluated the plaintiff for complaints of anger, frustration, and fluctuating mood.  The plaintiff reported that Xanax made him too sedated.

6

He admitted to becoming angry and tearful at times. Dr. Tesseneer diagnosed mood disorder and indicated that this could be cyclic in nature. He noted that the plaintiff's mother had mental problems by history. Dr. Tesseneer indicated that the plaintiff could not afford to pay for a counselor and advised that he seek counseling through a mental health clinic. Dr. Tesseneer prescribed Ativan and an increased dose of Depakote (Tr. 253). On April 20, 2012, Dr. Tesseneer spoke with the plaintiff's wife after being notified that the plaintiff was "still emotional and off balance." Dr. Tesseneer adjusted the plaintiff's medications (Tr. 253).

On May 9, 2012, Dr. Tesseneer completed a mental questionnaire at the Commissioner's request regarding the plaintiff's mood disorder, noting it was "possibly cyclic." The plaintiff's medication included Depakote and Ativan. Dr. Tesseneer was uncertain whether the medication helped the plaintiff's condition as he had not followed up with the plaintiff as of that date. Psychiatric care was recommended, but Dr. Tesseneer had not referred the plaintiff to anyone. The plaintiff was oriented, and his attention, concentration, and memory were adequate. Dr. Tesseneer thought that the plaintiff had "serious" work-related limitations in functioning due to his mental condition. However, Dr. Tesseneer did not provide any comments or identify the plaintiff's work-related limitation. He opined that the plaintiff was probably capable of managing his own funds, but he would need further evaluation (Tr. 263).

On May 23, 2012, Susan Calhoun, Ph.D., conducted a consultative psychological evaluation of the plaintiff, who contended that he was applying for disability because he "guesses that he's bipolar." The plaintiff reported that he had taken antidepressant medication since 1997, which a primary care physician prescribed. His current medication included Depakote and Ativan. The plaintiff reported being referred to a mental health clinic but indicated that they had referred him elsewhere. Dr. Calhoun indicated that the outcome of the referral was unclear. The plaintiff was married and had

7

a son.  His daily activities included watching television, feeding his dogs, doing yard work (e.g., cutting the lawn), and doing household chores (e.g., vacuuming and cleaning the bathroom).  He attended to his self-care needs and could prepare simple meals.  He went to church and attended his son's football games (Tr. 267-70).

The plaintiff was unkempt in appearance.  His eye contact was fair.  He was cooperative and quite talkative.  His mood and affect ranged from anxious to depressed. He scored 26 out of 30 on the mini-mental health exam.  His thought content was appropriate.  He was able to recall two of three items after interference.  His thought processes were distractible, but he could be redirected.  His affect and mood ranged from anxious to depressed.  His memory was good, and his attention and concentration were adequate (Tr. 268).  Dr. Calhoun's diagnostic impression was a mood disorder not otherwise specified ("NOS") and a personality disorder NOS, and she rated his Global Assessment of Functioning ("GAF")[3] at 62 (Tr. 268-69).  Dr. Calhoun thought that the plaintiff would function best in an environment that did not require ongoing interaction with the general public due to moderate limitations in social functioning (Tr. 269).  Dr. Calhoun determined that the plaintiff had:  (1)  a mild limitation with regard to his activities of daily living; (2)  a moderate limitation in understanding and carrying out detailed instructions; and (3)  a mild to moderate limitation in maintaining sufficient concentration and pace to carry out simple instructions and adjust to changes in a work environment (*id*.).

---

[3]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

On May 31, 2012, Dr. Tesseneer evaluated the plaintiff for episodes of anxiety and anger. The plaintiff reported that the mental health clinic advised him that they did not have the funds to see him. He reported having to increase his Ativan at night in order to sleep. Dr. Tesseneer diagnosed cyclic mood disorder likely due to bipolar. Dr. Tesseneer advised the plaintiff to seek counseling and refilled his Ativan and Depakote (Tr. 298).

On June 11, 2012, Frank Ferrell, M.D., a medical consultant on contract to the Administration, completed a Physical Residual Functional Capacity ("RFC") Assessment indicating that the plaintiff's physical impairments were not severe (Tr. 82-83).

On June 14, 2012, and August 20, 2012 (respectively), Anna Williams, Ph.D., and Xanthia Harkness, Ph.D., reviewed the plaintiff's file for the State agency (including the records from The Family Medical Center and Dr. Calhoun's consultative examination) (Tr. 71-76, 80-85, 92-97, 101-06). Drs. Williams and Harkness opined that the plaintiff could do regular work that did not involve the general public (Tr. 76, 97). His medically determinable mental impairments caused no restriction of daily activity; moderate difficulties in maintaining social functioning; mild difficulties in concentration, persistence, and pace; and no episodes of decompensation (Tr. 74-76). The plaintiff could attend and perform tasks without special supervision; attend work regularly; relate appropriately to supervisors and coworkers (though he may have problems with criticism); make work-related decisions and occupational adjustments; adhere to basic standards for hygiene and behavior; protect himself from normal workplace safety hazards; and use public transportation (Tr. 76, 97).

With Dr. Tesseneer's assistance, the plaintiff began therapy at Westgate Training and Consultant Network ("Westgate Center") on July 6, 2012 (Tr. 291, 297, 316, 342, 348). Because Westgate Center was a teaching facility and its graduate students were not considered experts in the field at that point in their careers, Westgate Center did not provide the plaintiff's progress notes or information on him other than what was

9

contained on a standard questionnaire, which Brenna von Hauzer, M.M.F.T., completed (Tr. 291, 316, 342, 348).

On August 2, 2012, Dr. Tesseneer evaluated the plaintiff. The plaintiff reported being unable to tolerate Depakote due to pain on the top of his head and that Seroquel made him feel "Zombied." Dr. Tesseneer noted that the plaintiff was in therapy through Westgate Center and that his therapist thought he had an element of post traumatic stress disorder ("PTSD") and OCD. Dr. Tesseneer indicated that the plaintiff had headaches possibly related to multiple inadvertent blows to the head while at different job activities. Dr. Tesseneer indicated that he would discuss use of Abilify with the plaintiff's counselor (Tr. 295-96).

On August 20, 2012, the plaintiff was admitted to the hospital for evaluation following a syncopal episode. He was diagnosed with syncope, bipolar disorder, and bradycardia. He was advised to continue taking Ativan and Depakote (Tr. 271-88).

On August 28, 2012, Dr. Tesseneer evaluated the plaintiff for hospital follow-up. Dr. Tesseneer indicated that the plaintiff was still somewhat shaky and had pain on the top of his head but had no further syncopal episodes. Dr. Tesseneer increased the plaintiff's dose of Depakote and continued his prescription for Ativan. He also started the plaintiff on Fioricet for headaches (Tr. 294-95).

On September 11, 2012, Dr. Tesseneer evaluated the plaintiff for follow-up of syncopal episodes. The plaintiff reported left-sided headaches and intermittent pain in his left ear when he lies on it at night. Dr. Tesseneer noted that the plaintiff chewed gum quite a bit and that the plaintiff's wife reported that he grits and grinds his teeth a great deal. On examination, Dr. Tesseneer found crepitans bilaterally but particularly on the left. Dr. Tesseneer indicated that the plaintiff was scheduled to see his counselor the following day and was hoping to have a better diagnosis. Dr. Tesseneer advised the plaintiff to decrease his Tylenol use and prescribed Naprosyn for temporomandibular joint ("TMJ") dysfunction.

10

He noted that they may change the plaintiff's psychotropic medications after discussing it with the plaintiff's counselor (Tr. 293-94).

On September 27, 2012, the plaintiff's therapist at Westgate Center, Brenna von Hauzer, MMFT, indicated that the plaintiff was in active treatment and had been seen for seven therapy sessions between July 6 and September 26, 2012. She reported that the plaintiff was diagnosed with an adjustment disorder (with mixed disturbance of emotions and conduct); PTSD, chronic delayed onset; and his GAF was rated at 60[4] at starting and 65 currently (Tr. 291).

On October 1, 2012, Dr. Tesseneer evaluated the plaintiff for follow-up of his mood disorder and suggestive bipolar disorder. The plaintiff reported that Depakote was helping "somewhat." The plaintiff reported low back pain that increased with activity. Dr. Tesseneer found the plaintiff 's back non-tender and his range of motion normal. Dr. Tesseneer diagnosed mood disorder and low back pain, suspected mechanical low back pain. He recommended that the plaintiff take three or four Advil with meals. Dr. Tesseneer indicated that the plaintiff felt that he could not work at that time due to his emotional status and that he would discuss the plaintiff 's psychiatric follow-up with the plaintiff 's counselor. Dr. Tesseneer also noted that the plaintiff 's attorney had requested completion of a form, which he would review (Tr. 292).

On October 31, 2012, Dr. Tesseneer completed a questionnaire at the request of the plaintiff's attorney. The plaintiff's impairments included PTSD, anxiety, and depression. Dr. Tesseneer thought that it was probable that the plaintiff would have problems with his attention and concentration sufficient to frequently interrupt tasks during the workday and that he had been impaired since March 6, 2012. The basis for the opinion

---

[4]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *DSM-IV*, 32-34 (Text Revision 4th ed. 2000).

was Dr. Tesseneer's personal observations and the impressions of the plaintiff's counselor. Dr. Tesseneer did not submit any records from the plaintiff's counselor as support for his opinion (Tr. 312-13).

On November 1, 2012, Dr. Tesseneer evaluated the plaintiff. Dr. Tesseneer indicated that the plaintiff was in moderate distress, had good judgment but poor insight, and was anxious. Dr. Tesseneer diagnosed dysthymic disorder and acute bronchitis (Tr. 336-38).

On January 15, 2013, Dr. Tesseneer evaluated the plaintiff for multiple problems including difficulty sleeping. The plaintiff also reported difficulty with cramping in his hands and feet and difficulty gripping with his left hand related to a motor vehicle accident several years prior. Dr. Tesseneer indicated that the plaintiff was in moderate distress. The plaintiff reported that Depakote helps in that he was less agitated but still angry. Dr. Tesseneer's assessment included dysthymic disorder, adjustment reaction and PTSD, and mononeuritis. Dr. Tesseneer prescribed Celexa and ordered blood work (Tr. 333-35).

On January 23, 2013, Dr. Tesseneer signed a statement that the plaintiff's attorney provided based on Dr. Tesseneer's conversation with the office of the plaintiff's attorney (Tr. 314-15). Dr. Tesseneer stated that at the plaintiff's first visit, he was administered a screening questionnaire that suggested he had a bipolar disorder (Tr. 314). He was started on medication (Tr. 315). The plaintiff complained that he had difficulty maintaining relationships and working, and he felt that he was not functioning well. Although the plaintiff endorsed a history of what sounded like manic behavior, Dr. Tesseneer advised that he had not seen the plaintiff exhibit any manic behavior. The plaintiff appeared physically slow, and he seemed apathetic and displayed some cognitive slowing and lethargy (Tr. 314). Dr. Tesseneer felt that, based on the plaintiff's presentation, he would be limited in his ability to initiate and maintain work relationships or follow simple

12

instructions reliably.  Dr. Tesseneer thought that a psychiatrist should evaluate the plaintiff, but he said that the plaintiff had financial issues that prevented this (Tr. 314).  The plaintiff had medical coverage through Medicaid (Tr. 333).

On February 5, 2013, Dr. Tesseneer evaluated the plaintiff for upper respiratory symptoms and prescribed medications for this (Tr. 330-32).  On February 13, 2013, Dr. Tesseneer evaluated the plaintiff for follow-up of COPD.  The plaintiff reported that he was doing much better.  He admitted that he continued to smoke but reported trying to cut back.  No changes were made to the plaintiff's medications (Tr. 327-29).

On February 22, 2013, Ms. Von Hauzen provided a statement indicating that she had seen the plaintiff for 14 sessions of psychotherapy since July 6, 2012.  Ms. Von Hauzen indicated that the plaintiff was committed to therapy and had always made his appointments and did any assigned homework from their sessions.  Ms. Von Hauzen indicated that the plaintiff reported obsessive thoughts processes, which often resulted in poor emotion regulation and took a considerable amount of time out of the plaintiff's day.  She noted that the plaintiff reported "finding patterns in things" and feeling overwhelmed by tasks that were doable for him previously.  Ms. Von Hauzen indicated that the plaintiff's diagnosis was OCD, and he had a current GAF of 60 (Tr. 316).

On April 2, 2013, Dr. Tesseneer provided a medical source statement (Tr. 340-41).  Dr. Tesseneer saw the plaintiff that same day (Tr. 318-20).  Dr. Tesseneer thought that the plaintiff had chronic, lifetime limitations that had worsened in the past five years (Tr. 341).  The plaintiff complained of anxiety, depression, and agitation at the visit, but Dr. Tesseneer reported that he was active, alert, oriented, and exhibited good judgment (Tr. 319). Dr. Tesseneer rated the plaintiff's ability to make occupational (e.g., can function independently 70% of the workday), performance (e.g., can understand, remember, and carry out simple job instructions 50% of the workday), and personal-social (e.g., can demonstrate reliability 70% of the workday) adjustments.  The plaintiff could understand,

13

remember, and carry out simple job instructions 50% of the time; could understand, remember, and carry out detailed, but not complex, job instructions 40% of the time; and could understand, remember, and carry out complex job instructions 30% of the time. However, Dr. Tesseneer did not describe any specific mental limitation from these ratings (Tr. 340-41). The only specific limitation that Dr. Tesseneer identified was that the plaintiff tended to drop tools (Tr. 341). Dr. Tesseneer also did not include any specific medical and clinical findings (e.g., problems in memory, comprehension, etc.) that supported his ratings. Dr. Tesseneer indicated that the plaintiff would be able to manage his own benefits. Dr. Tesseneer opined that the plaintiff's impairments and limitations were chronic and had been present throughout his lifetime but were "exacerbated in past 10 years" (Tr. 340-41). Dr. Tesseneer evaluated the plaintiff and noted that he continued to see a counselor for OCD and PTSD symptoms. Dr. Tesseneer indicated that on examination the plaintiff had decreased breath sounds and expiratory wheeze. Dr. Tesseneer prescribed Albuterol and Celexa (Tr. 318-20).

On May 13, 2013, Ms. Von Hauzen indicated the plaintiff's diagnosis was OCD, partner – relational. Ms. Von Hauzen provided a summary indicating that she had seen the plaintiff for 17 sessions of therapy with his last session being May 7, 2013. She indicated that the plaintiff made good therapeutic use of their time. Ms. Von Hauzen stated that the plaintiff had a starting GAF of 45 and most current GAF of 50[5] (Tr. 342). The plaintiff's most recent session was on October 12, 2013, where his diagnoses remained OCD and relational problems NOS (Tr. 348).

On October 28, 2013, Dr. Tesseneer signed another statement in which he reported that he last saw the plaintiff in July 2013 (Tr. 349; see Tr. 345-47). Dr. Tesseneer

---

[5] A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *DSM-IV*, 32-34 (Text Revision 4th ed. 2000).

explained that in the past the plaintiff had "usually presented as lethargic and depressed, as I have previously described. He goes back and forth between agitated and lethargic, and that is consistent with the nature of his condition" (Tr. 349). Nonetheless, Dr. Tesseneer noted that the plaintiff was active, alert and oriented, and he displayed good judgment (Tr. 346). Dr. Tesseneer thought that the plaintiff's mental health issues continued to be the primary reason why he could not work, and he continued to have the same limitations previously described (Tr. 349).

On November 14, 2013, Dr. Tesseneer evaluated the plaintiff for follow-up of multiple conditions and medication refills. He noted that the plaintiff continued to smoke and had morning cough and wheezing. Dr. Tesseneer noted that the plaintiff appeared anxious and depressed. He diagnosed anxiety state, COPD, and dysthymia. He prescribed Dulera, lorazepam, Depakote, and bupropion (Tr. 351-54).

### Other Evidence

In an April 12, 2012, function report, the plaintiff reported that he did not have a problem dressing himself, bathing himself, caring for his hair, shaving himself, feeding himself, and using the toilet independently (Tr. 187). He did not need special reminders to take care of his personal needs and grooming (Tr. 188). He vacuumed weekly and did yard work daily; "piddled" around; cared for his pets (e.g., fed them); drove a car; and shopped in stores for groceries and household items (Tr. 187-90). He went outside every day (Tr. 189). He could go out alone (Tr. 186, 189, 191). He spent time with others. He went to church, visited his mother, and talked to his father on the telephone (Tr. 190). He watched television (Tr. 189). The plaintiff stated that his conditions affected his talking, hearing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others (Tr. 191). He did not indicate that his conditions affected his ability to lift, stand, walk, sit, bend, and reach (Tr. 191).

15

The plaintiff testified at the administrative hearing that he lived in a mobile home with his wife and 14 year old son (Tr. 35). The plaintiff cut the grass and attended to the plants and trees in the yard (Tr. 43). He helped his wife keep the house clean, and he fed the dogs (Tr. 43). The plaintiff said that Dr. Tessenner indicated that he might be bipolar (Tr. 46). The plaintiff contended that he got angry and frustrated often, and sometimes he was angry and sometimes he was nice (Tr. 47). The plaintiff went to his son's football games and sometimes went to church. However, he contended that he could not deal with all of the screaming and hollering at the football games, and sometimes he did not like to deal with the loud music at church (Tr. 50). As to his OCD, the plaintiff testified that he obsessed over things all day, liked counting and organizing things, and had trouble sleeping because of his condition (Tr. 51-52).

The plaintiff was married to Mrs. Thomas for 16 years (Tr. 54). Mrs. Thomas testified that the plaintiff had problems getting along with others at his previous jobs; he had trouble answering simple questions; and he was sometimes overbearing with his son (Tr. 55-57). At church, the plaintiff sometimes became irritable when the music played, and he would run out, and he folded a napkin repeatedly during the service and counted things (Tr. 57-58). He had always been obsessive (Tr. 58). He liked things organized. Since he started taking medication, he was irritable and more emotional (Tr. 59). He still got angry and suddenly agitated but not as often as he used to. He did not go out in public often (Tr. 60). He spent his time planting trees (Tr. 61).

At the hearing, the ALJ asked the vocational expert whether there was work available in the national economy for a hypothetical individual who (1) was the plaintiff's age and had his education and work history; (2) could perform medium work with no concentrated exposure to dust or fumes; (3) was limited to simple, repetitive tasks and instructions and jobs with no public contact; and (4) could not work closely with other people (e.g., no work groups) (Tr. 66-67). The vocational expert testified that the individual

16

could perform work in such representative occupations as kitchen helper/dishwasher and hand packer (Tr. 67-68).

The ALJ asked if because of anxiety and problems with focus and attention a person "could not stay on task or at the work station for as much as two hours at a time or would require more than the usual number of breaks during a day and by that, I mean more than 15 minutes in the morning and 30 minutes at lunch and 15 minutes in the afternoon - - would these jobs or any others be available?"  The vocational expert responded that there would not be any jobs available.  The vocational expert also responded that there would be no work for an individual who "could not consistently work 8 hours a day 5 days a week or would miss 3 or more days of work per month" (Tr. 68).

## ANALYSIS

The plaintiff argues the ALJ erred by:  (1)  failing to consider or investigate his inability to pursue certain treatment and (2) failing to properly evaluate and consider the multiple opinions of treating physician Dr. Tesseneer (docs. 12, 14).

### *Failure to Pursue Treatment*

The plaintiff contends that the ALJ erred by drawing a negative inference regarding his failure to obtain certain treatment without considering any explanations he might have such as inability to afford such treatment (doc. 12 at 24-26).  In assessing the plaintiff's credibility in the RFC finding, the ALJ noted that the plaintiff had a history of a mood disorder, OCD, and anxiety disorder, but further noted that "the record does not show any inpatient psychiatric hospitalizations or specialized treatment from a psychiatrist" (Tr. 26).

An individual's medical treatment history is one of the factors that an ALJ may consider in assessing his credibility. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96–7p, 1996 WL 374186, at *3.  However, the Fourth Circuit has found that a "claimant may not be penalized for failing to seek treatment he cannot afford; '[i]t flies in the face of the

17

patent purpose of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)). While an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure[,] . . . the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ." SSR 96–7p, 1996 WL 374186, at *7.

As noted by the plaintiff, the record contains several references to his inability to afford certain treatment. On March 6, 2012, Dr. Tesseneer started the plaintiff on a trial of Seroquel and noted that he might need assistance in obtaining medications due to financial constraints (Tr. 255). On April 2, 2012, Dr. Tesseneer indicated that the plaintiff could not afford to pay for a counselor and advised that he seek counseling through a mental health clinic (Tr. 253). Dr. Tesseneer noted in May 2012 that the plaintiff went to a mental health clinic, but the counselor advised that the clinic did not have the funds to see him (Tr. 298; *see* Tr. 45). Dr. Tesseneer noted on the same date, "Seek to obtain counselor for the patient. He is a Medicaid recipient" (Tr. 298). On June 12, 2012, a nurse at the Family Medical Center, where Dr. Tesseneer practiced, noted that she had contacted "Turning Leaves" on behalf of the plaintiff, but it did not accept Medicaid. The nurse then contacted Westgate Center on the same date and noted that it also did not accept Medicaid, but Westgate Center would set up a sliding fee scale for the plaintiff based on his household income (Tr. 297). The nurse notified the plaintiff's wife and gave her the number to call to set up an appointment (Tr. 297). The plaintiff began treatment at Westgate Center on July 6, 2012, as detailed above (Tr. 291, 297, 316, 342, 348). On

18

January 23, 2013, Dr. Tesseneer indicated that ideally the plaintiff "should be evaluated and treated by a psychiatrist, but he has had financial issues that have prevented him from doing this" (Tr. 314).

The Commissioner argues in response that the plaintiff had medical coverage through Medicaid and "did not provide an explanation about why he chose not to seek psychiatric treatment, especially given that he had coverage through Medicaid" (doc. 13 at 19). However, as noted by the plaintiff, while it is the plaintiff's burden to prove his disability, it was up to the ALJ to provide "specific factual findings regarding the resources available to [the plaintiff] and whether [his] failure to seek additional medical treatment was based upon [his] alleged inability to pay." *Dozier v. Colvin*, C.A. No. 1:14-cv-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015). The Commissioner notes that the plaintiff testified at the hearing that he went to "Spartanburg," but they were not taking patients at that time; however, he did not say that he was refused treatment because "Spartanburg" did not take Medicaid, and he could not afford the treatment (doc. 13 at 19). Moreover, the ALJ did not ask the reason why the plaintiff was refused treatment (*see* Tr. 45). *See Dozier*, 2015 WL 4726949, at *4 ("However, the ALJ did not inquire about Dozier's effort to obtain treatment from such agencies at the ALJ hearing.").

The Commissioner further argues that "the ALJ did not base her decision predominantly on the fact that Plaintiff had not received psychiatric treatment" (doc. 13 at 19). Rather, the Commissioner contends that the decision was based primarily "on what the medical evidence said" (*id.*). However, nowhere in the decision does the ALJ state her primary reason for the RFC finding. Courts in this district have consistently found remand necessary where the ALJ considered the claimant's failure to seek treatment as a factor in the disability determination despite evidence in the record of the claimant's inability to afford treatment. *See, e.g., Camper v. Colvin*, C.A. No. 1:14-4801-MGL-SVH, 2015 WL 7566266, at *16 (D.S.C. Oct. 16, 2015) (finding credibility analysis was flawed and remanding

19

because "it appears that the ALJ drew negative inferences about Plaintiff's failure to pursue additional testing and treatment without considering indications in the record that Plaintiff lacked the financial resources to obtain such treatment"), *R&R adopted by* 2015 WL 7568595 (Nov. 24, 2015); *Brownlee–Nobs v. Colvin*, C.A. No. 1:14–cv–03988-JMC, 2015 WL 5908524, at *14-15 (D.S.C. Oct. 7, 2015) (remanding where ALJ "failed to make specific findings regarding the resources available to Plaintiff and whether her failure to seek additional treatment and medication was based upon her inability to pay").

Accordingly, upon remand, the ALJ should consider and make factual findings regarding the plaintiff's financial situation and its impact on his ability to seek medical treatment, including "specialized treatment from a psychiatrist" (*see* Tr. 26), in evaluating the plaintiff's credibility and in assessing his RFC. *See Dozier*, 2015 WL 4726949, at *4 (remanding case due to ALJ's improper penalization of the claimant for her failure to seek treatment and instructing ALJ to make factual findings regarding the claimant's financial situation and its impact on her ability to seek medical treatment).

Based upon the foregoing, the undersigned recommends that this case be remanded. As the ALJ's improper penalization of the plaintiff for his failure to seek psychiatric treatment is a sufficient basis for remand, the undersigned will not address the plaintiff's remaining allegation of error. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the ALJ should consider the plaintiff's arguments that she failed to properly evaluate Dr. Tesseneer's October 2012, January 2013, and October 2013 opinions and failed to weigh or discuss Dr. Tesseneer's April 2013 opinion (doc. 12 at 17-24; doc. 14 at 1-10).

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 24, 2016
Greenville, South Carolina

21